STATE, Respondent, vs. BARTHULY, Appellant.

*February 7—February 28, 1958.*

430

For the appellant there was a brief and oral argument by *Nathaniel D. Rothstein* and *Paul C. Konnor,* both of Milwaukee.

For the respondent the cause was submitted on the brief of the *Attorney General* and *William A. Platz,* assistant attorney general, and *Eugene F. McEssey,* district attorney of Fond du Lac county, attorneys, and *John H. Bowers,* assistant attorney general, of counsel.

STEINLE, J.   The primary issue on this appeal relates to the sufficiency of the evidence to sustain the conviction of the defendant, Herbert W. Barthuly, with respect to each of the counts in the information charging him with having maliciously threatened to accuse John Staples of the crime of sodomy with intent to extort money. The defendant contends that the evidence does not establish (1) a threat to accuse of any particular crime or offense; (2) nor an intent

to extort. It is the position of the state that the essential elements of the crime of extortion were established.

The offense in count 1 was charged under sec. 340.45, Stats. 1953. The offenses in counts 2 and 3 were charged under sec. 943.30, Stats. 1955.

Sec. 340.45, Stats. 1953, provided as follows:

"Any person who shall, either verbally or by any written or printed communication, maliciously threaten to accuse another of any crime or offense, or to do any injury to the person, property, business, profession, calling or trade, or the profits and income of any business, profession, calling or trade of another, with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do any act against his will or omit to do any lawful act, shall be punished by imprisonment in the state prison not more than two years nor less than one year or by fine not exceeding five hundred dollars nor less than one hundred dollars."

Sec. 943.30, Stats. 1955, provides as follows:

"Whoever, either verbally or by any written or printed communication, maliciously threatens to accuse another of any crime or offense, or to do any injury to the person, property, business, profession, calling or trade, or the profits and income of any business, profession, calling or trade of another, with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do any act against his will or omit to do any lawful act, may be fined not more than $2,000 or imprisoned not more than five years or both."

Viewing the facts in the light most favorable to the state, as we must, it appears that Staples and the defendant met for the first time in 1949. They became "close friends" and continued their association, licit and illicit, until the defendant entered the military service in 1953. Staples testified that he and the defendant engaged in about thirty "sex acts" before the defendant entered military service. Staples paid the

defendant $5 for each of such acts. While the defendant was in the military service, Staples wrote to him constantly, called him by telephone frequently, and sent gifts to him. The defendant was discharged from military service in January, 1955. On the very night that the defendant arrived at home, Staples went to see him. They met continuously thereafter—every night that the defendant was in town—until his arrest on October 25, 1956. Staples testified that he embezzled $19,000 from his employer and gave it all to the defendant. In part, Staples testified as follows (abridged):

"I don't know just how to go about it as to why I gave Herb the $19,000, but it goes back to the complete point that from the time that Herb came out of the service, that is January of 1955; it appeared to me, it was the way he had acted toward me before he went into the service, and during the time that he was in service, and to all intents he was in his actions to me a perfect friend and a gentleman, but when he came out of the service, by his actions toward me I took him to change quite a bit, and we had several discussions about that which went on between us before he went into service in regard to the sex acts. I had asked him several times whether or not I had anything to worry about in regards to anything getting out by a slipping of the tongue in any way, shape, or manner, but I never got a definite answer, and I know for a fact that we got to a point where we would make bets until I worried, and I became completely frightened of him from that standpoint, and I worried that he might through his drinking and so forth make a slip of the tongue in regard to what went on between us; so I became more deeply involved in regards to the fact, and I myself suggested these different bets in regard to the number of drinks he might have a night and times he would get in nights, for I thought that if he could control that I would not have to worry about his drinking and any slip of the tongue by him, and for that reason the money was paid in regards to these bets; the bets that I made with Barthuly would vary and I could not pin it down to an exact sum. The bets started out at a dollar or two on the number of drinks, and of course they went up to an obnoxiously large sum; there

were $25 bets, $30 bets, $40 bets, and $50 bets, and there may have been some bets over $50; I was afraid of Mr. Barthuly because I thought he had changed so much in the two years he had been in the service, and he did not act like the same person; in these past two years it seemed to me in my relations with him that I always thought that Herb was completely right about what he said and was doing and whatever I said to him I always had to back down on my conversations, for he was the one that was right. As far as I was concerned I felt that Herbert Barthuly lived with the fact that he knew what was going on all the time and I did not, and on numerous occasions I asked him whether I had anything to worry about and I got a shrug from the shoulders and that, and because of the fact that I never got a definite answer from him I became afraid that there would be a leakage at any time or place to any one, and I felt that I would then completely ruin my family. Late in 1955 or right after the first of 1956 we got into a discussion and I became highly upset about it, and Mr. Barthuly told me that if there were leakages either on my part or on his part that he had nothing to worry about; that he would go to what he termed the 'proper authorities;' whatever he meant by 'proper authorities' I don't know, and he told me that he wouldn't have anything to worry about, that he would be completely freed of anything, and that it would be all my fault from the standpoint that I had previously been in trouble. The conversation went on to the effect that I had been arrested for serving minors in the tavern three times, and of that twice were convictions. I don't know by his use of 'proper authorities' whether he meant his family, and I became completely afraid of his family; I don't know whether he meant the police authorities or the pastor of his church; I would not have any idea of what he meant by 'proper authorities,' for it could have meant any number of people. . . .

"All these bets for instance were bet on a certain number of drinks he would have a night; I was not with him wherever he was, so that when he came back the next night I would ask him how many drinks he had and when he said he had the amount of drinks that were bet on, I paid him the bet; it would have been impossible for me to check up on him to see how many drinks he had; I was the one that

suggested these bets between myself and Mr. Barthuly for the reason that I thought that no matter what way this money was paid, it was a way of keeping these other acts from being made public knowledge. . . .

". . . I paid Barthuly the sum of $300 in June of 1956 for sex acts; I approached him with respect to these sex acts and the reason I approached him I figured no matter in what way any moneys that I gave him, and how deeply I got involved financially, that it would still keep things from leaking out to public knowledge, and I figured that another sex act would not make it any worse or any less; the sex act that I had with him in June of 1956 was the first sex act that I had with him since Barthuly got out of the service; Mr. Barthuly was the one who set the price for this sex act and the discussion of the price of the sex act took place in my room on Scott street; the discussion ran like this: I offered Barthuly $100 and he said it wasn't enough and we had a discussion for about a week's time and he said that a $100 was not enough and it should be $300, and finally I agreed to give him $300 for the sex act, and the act took place, and the reason that I agreed to pay him $300 instead of $100 for the sex act was because I always let Herb have his way with me because I was afraid that there would be a leakage of information; I also paid for the sex act with Barthuly before he went into service; the price I paid him was never more than $5; I had a second sex act with Barthuly during the month of July, 1956, and I paid him $1,000 for that sex act; that was in July of 1956 and we arrived at the figure of $1,000 the same way as the previous sex act, by way of having discussions with him for a period of a week or so; Barthuly set the final figure and of course I agreed to it; I did dicker about the price because I thought it was too much but we had no argument about it, but merely a discussion; I paid the $300 for the first sex act after Barthuly got out of service, and I also paid the $1,000 for the second sex act; I did not pay him $800 in October of 1956 . . . during the first part of October, 1956, Mr. Barthuly did tell me in my room on Marr street that he needed $800 by the end of the week, for what I don't know; Barthuly stated that he needed it by Friday night but I didn't pay him the $800 for the reason that I could not raise it; . . .

". . . the bets that I made with him was not to keep him from drinking but was to keep him within a certain limitation of drinks. . . .

". . . I owed him $1,700 at the time that I was arrested."

The testimony of Staples with reference to the defendant's statement that if there were leakages the defendant would go to the proper authorities, was received in evidence over objection on the ground that it was remote and unconnected. Likewise received in evidence over similar objection was the testimony of Staples regarding an argument between the parties in April, 1956, when, at the defendant's home, Staples accused the defendant of being "snotty and unappreciative of favors previously extended" after which the defendant shook Staples and threatened to beat him within an inch of his life should Staples ever again bring up the fact that he had performed favors for the defendant. Staples also testified as follows:

"*Q.* When was the first time that he ever suggested to you that you should pay him some money on money owing for bets or clothing? *A.* Well, sometime after,—I would say within three weeks after the second sex act in July; he thought that because there was an arrearage then at that time of several hundred dollars, that I should make it a point of giving him—he didn't insist upon it, he said: 'Don't you think you better get a couple of hundred dollars by tomorrow night?' "

It appears without dispute that the defendant had no knowledge of the embezzlement by Staples from his employer. He assumed on the basis of representation by Staples that it was money received by way of inheritance. It is also undisputed that Staples followed the defendant practically daily,—on the defendant's way to work and other places. Staples testified that the defendant told him that if he did not stop following him around, he would report him to the

authorities. The record fails to reveal that any specific verbal threats to extort money were made at the times charged in the information. The evidence with reference to events occurring on the dates averred in counts 1 and 2 indicate that the discussion between the parties at such times related to the commission of acts of perversion and the payment therefor. As to count 3 the evidence indicates that the discussions related to payments of bets. According to Staples' own testimony, the so-called "bets" were mere voluntary payments made by him to the defendant in an attempt to insure that the defendant would not indulge in the use of alcoholics to such extent that he might be likely to "talk out of school." Manifestly Staples believed that the defendant would not reveal the aberrant conduct of the parties when he was sober. It is thus reasonable to conclude that the conversation relative to the payments and the payments themselves were made to keep the defendant sober.

The state urges that the court was justified on the basis of the evidence in believing and finding that the defendant knew that he held Staples in fear of disclosure of the sex activities, and that he played upon Staples' fear and credulity by innuendo or suggestion for the purpose of extorting money. It is also maintained that the defendant obviously recognized that a simple suggestion to Staples to the effect, "Don't you think you better get a couple of hundred dollars by tomorrow night?" was sufficient to accomplish the purpose. However, after a very careful review of all of the evidence we consider that the discussion of, and the acceptance by, the defendant of Staples' payments on October 1, 1956, the date specified in count 3, fall short of a verbal communication—either express or in vague form or by innuendo—maliciously threatening to accuse Staples publicly of the offense of sodomy with the intent thereby to extort money. We share the same view with reference to conversations and payments made on

the dates alleged in counts 1 and 2. In our opinion the evidence did not suffice to sustain the conviction of extortion as to any count in the information charging such offense.

Were it to be held that the court when determining the issues was entitled to consider conduct and statements by the defendant prior to the dates specified in the counts in question with the statements made at such times, such evidence still would not have been sufficient upon which to properly predicate a finding beyond reasonable doubt.

In view of these conclusions we deem it unnecessary to determine other questions presented.

*By the Court.*—The portion of the judgment appealed from is reversed, with directions to dismiss the charges involved in counts 1, 2, and 3 of the information and to render null the sentences imposed thereon.

MARTIN, C. J. (*dissenting*). I must respectfully dissent from the decision of the majority in the above matter. They reverse principally for the reason that the testimony had not established a threat beyond a reasonable doubt.

After reading the testimony as set out in the opinion of the majority, it is hard to come to any conclusion but that the victim was for the past number of years in a constant state of dread, inflamed by a guilty conscience, that the defendant would reveal information regarding their association, that it would ruin him and his family socially, that he would lose his job, and suffer all the attendant scorn of his neighbors and friends. This must have had a very startling effect on his mental condition, and it would take little more than the shrug of the shoulders or the inflection of the voice to act as a threat to him and produce just the result that it did—the payment of large sums of money to the defendant. His testimony that the defendant told him he would go to the "proper authorities," that the victim would be the one to suffer, as he had a police record, that he had better "get the money

to him by tomorrow night"—all these things, in view of the mental state of the victim, are sufficient to constitute a threat.

What constitutes a threat should not be judged by what would be a threat to the ordinary person but by what is a threat to one in the guilty position of this individual. I feel that the trial court was justified in holding as it did. As to whether or not a threat was proved was, in the first instance, for the trier of the fact.

I am authorized to say that Mr. Justice CURRIE joins me in this dissent.